ENERGETIC WORSTED CORP. *v.* UNITED STATES (No. 5160)*

*C.A.D. 874.

United States Court of Customs and Patent Appeals, April 7, 1966

*William Whynman, Leon I. Mesirov* (*Mesirov, Gelman, Jaffe & Levin*, of counsel) for appellant.

*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Glen E. Harris* for the United States.

[Oral argument November 1, 1965 by Mr. Mesirov and Mr. Harris]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Associate Judges

MARTIN, Judge, delivered the opinion of the court:

This appeal is from the judgment of the Third Division of the United States Customs Court in *Energetic Worsted Corp.* v. *United States*, 51 Cust. Ct. 55, C.D. 2413, overruling the protest of the appellant-importer, Energetic Worsted Corp. (hereinafter Energetic), against the assessment of countervailing duty on five entries of wool tops [1] exported from Uruguay in May through September of 1953, and entered at Philadelphia in June through October of 1953. The regular duties are not in issue.

Authority for assessment of a countervailing duty is provided for in section 303 of the Tariff Act of 1930, reading:

Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

The collector's assessment of countervailing duty on the present merchandise was predicated on a notice promulgated by the Secretary

---

[1] Wool tops are packages of raw wool, scoured, combed and prepared in continuous ropelike form ready to be spun into yarn.

of the Treasury on May 6, 1953, T.D. 53257, 88 Treas. Dec. 105, 18 Fed. Reg. 2653. That notice reads:

*Countervailing duties on imports of wool tops from Uruguay*

Notice of countervailing duties to be imposed under section 303, Tariff Act of 1930, by reason of the payment or bestowal of a bounty or grant on exports of wool tops from Uruguay

TREASURY DEPARTMENT,
OFFICE OF THE COMMISSIONER OF CUSTOMS,
*Washington, D.C.*

*To Collectors of Customs and Others Concerned:*

The Bureau has received information concerning the export of wool tops to the United States from Uruguay which satisfies the Bureau that such exports receive bounties or grants within the meaning of section 303 of the Tariff Act of 1930 (19 U.S.C. 1303). Accordingly, notice is hereby given that wool tops imported directly or indirectly from Uruguay, expect any such importations which are free of duty under the Tariff Act of 1930, if entered for consumption or withdrawn from warehouse for consumption, after the expiration of 30 days after publication of this decision in the weekly Treasury Decisions, will be subject to the payment of countervailing duties equal to the net amount of any bounty or grant determined or estimated to have been paid or bestowed upon their exportation from Uruguay.

In accordance with section 303, it is hereby estimated and determined that under existing conditions the net amount of such bounty or grant is 18 percent of the sum of the invoice value of the wool tops *per se* and any dutiable charges applicable to such tops. On and after the effective date of this notice, and until further notice, upon the entry for consumption or withdrawal from warehouse for consumption of such dutiable wool tops, imported directly or indirectly from Uruguay, there shall be collected, in addition to any other duties estimated or determined to be due, countervailing duties in the amount ascertained in accordance with the above estimation and determination.

D. B. STRUBINGER,
*Acting Commissioner of Customs.*

Approved May 6, 1953:
G. M. HUMPHREY,
*Secretary of the Treasury.*

[Filed with the Division of the Federal Register May 6, 1953, 11:30 a.m.]

After consideration of evidence introduced by both parties, a majority of the trial court held that a multiple exchange rate system in force in Uruguay at the time the goods were exported resulted in a bounty or grant being conferred on the export of wool tops, and thus required the imposition of a countervailing duty pursuant to section 303 of the Tariff Act of 1930, supra. A third judge dissented.

The record shows that, throughout the period involved here, Uruguay had in effect a foreign exchange control system which required that all foreign currency received for exports be paid into the Bank of the Republic (the Government bank of Uruguay) in exchange for Uruguayan pesos, at rates of exchange fixed from time to time by the

Uruguayan government, and that any foreign exchange needed for payment for imports be purchased from that bank at rates of exchange set by the government. Included in the evidence is a copy of a decree, promulgated by the Uruguayan government on September 25, 1947, authorizing the Executive to grant preferential exchange treatment through establishment of exchange rates varying between 1.519 and 1.78 pesos per dollar "for industries which need it in order to place their products abroad." Other decrees were promulgated subsequently from time to time assigning different rates to different commodities, said rates ranging from 1.519 to 2.35 pesos per dollar.

During the particular period here involved, the rate of exchange applicable to wool in grease was 1.519 pesos per dollar and the rate applicable to certain woolen manufactures was 2.35 pesos to the dollar. Exports of wool tops were subjected to a combined rate of 76 percent at 2.35 pesos per dollar and 24 percent at 1.519 pesos per dollar, equivalent to an effective rate of 2.15 pesos per dollar.[2] On July 23, 1953, that rate was modified to 65 percent at 2.35 pesos per dollar and 35 percent at 1.519 pesos per dollar, making an effective rate of 2.06 pesos per dollar.

In the operation of the exchange system, exporters from Uruguay were required to file a sworn declaration of a transaction with the government exchange control authorities giving in detail the terms and conditions of sale. Unless the authorities considered that the exporter was getting a fair market value for his merchandise, the declaration was not accepted. Where the sale was permitted, the exporter was required to surrender to the Bank of the Republic the foreign exchange received in return for which he received pesos at the rate assigned to the commodity involved.[3]

The wool tops presently involved were exported from Uruguay under the system described with the seller receiving a credit of 2.15 pesos per dollar for 95 percent of the dollars paid and retaining 5 percent in dollars. The general manager of Engraw Export & Import Company, the Uruguayan company which sold the goods, testified that it sold wool tops to countries other than the United States at substantially the same price as it sold to Energetic. He further stated that the price to Energetic was not influenced in any way by the rate of exchange and that the seller did not receive directly or indirectly any other payment, concession or thing of value from Uruguay or any political subdivision thereof in connection with the manufacture, production, or exportation of the merchandise. The witness also testified that the firm would not have been able to sell wool tops for export

[2] Set out in decree dated May 27, 1952 and subsequently extended by later decree.
[3] The record shows that the exporters of wool tops and wool in grease were permitted to retain 5 percent of the dollars received to use for any purpose, including sale at the prevailing free market rate. There is testimony that exporters to other than "free" dollar areas were allowed to retain only 2 percent of the foreign exchange received.

to the United States profitably at the exchange rate of 1.519 pesos per dollar.

The first issue raised here is whether the Customs Court erred in holding that the facts support the Treasury Department's finding that wool tops exported from Uruguay at the time in question received a bounty or grant within the meaning of section 303 of the Tariff Act of 1930.

The government's witness Hartley, Chief of the Latin American Division of the Office of International Finance of the Treasury Department since 1955, testified that he became familiar with the records of the previous activities of that division in connection with the imposition of countervailing duties on wool tops from Uruguay in 1953. He stated that his studies in that connection showed that the Division

made a very thorough examination of the Uruguayan exchange rate system, the relationship thereto of the rate for wool tops, study of the trends of trade of wool top exports from Uruguay, a study of the effect of the exchange rate given to wool tops upon the price at which Uruguayan wool tops were sold in the United States market.

Those studies, according to the witness, disclosed that exports of wool tops from Uruguay into the United States were very small in 1947 and 1948 and increased somewhat in 1949. They increased further to over 1 million pounds in 1950, to 3.7 million pounds in 1951, and to 17 million pounds in 1952.

Hartley also stated that the Division investigated the competitive position of Uruguayan wool tops in the United States with regard to price. The studies showed that, except for December 1951 and January 1952, Uruguayan wool tops were selling at amounts varying from 5 to 67 cents per pound below the cost of American made tops.

Further explanation of the conditions which gave rise to imposition of the countervailing duty is found in a letter of the Assistant Secretary of the Treasury, dated February 8, 1957. That letter states:

In the case of Uruguayan wool tops, the granting of more favorable export rates by Uruguayan authorities was followed by very large increases in U.S. imports of this commodity. In the absence of new factors contributing to substantially increased productivity in Uruguay, this increase indicated that the preferential rate for wool tops had, in fact, given an unfair competitive advantage to Uruguayan wool tops entering the markets of the United States.

As to the method used by the Treasury in determining the question of a countervailing duty, which method involved calculating a representative rate of exchange or "benchmark," the witness Hartley testified:

It [the Uruguayan exchange system] was a multiple exchange system with a basic rate of 1.519, and two other rates on the export side, plus four mixed rates at the time the first study was made. On the import side, three so-called basic rates. We wish to relate the wool tops rate to something in order to form a judgment whether or not this was a bounty under the terms of the law. We

thought that the most representative, intelligent thing to do would be to take a weighted average of all the rates used, both on the export and import side; by weighted average I mean we took full account of the total value of exchange that was bought and sold at each rate, and that went into the computation. The resulting weighted average, which we have since called a representative rate, turned out to be 1.86 pesos to the dollar. We compared this 1.86 with the then existing rate on wool tops, and determined that 18 per cent would be an appropriate countervailing duty.

That witness further testified that the Treasury had based its calculations on the most recent exchange rates for 1953 weighted in accordance with the latest available trade statistics which were those of 1951. He stated also that consideration was given to operations in the free market as to merchandise transactions and to the 5 percent of the exchange retained by the exporter. Total export and import figures were used rather than those with the United States alone. The resulting weighted average of 1.86 pesos per dollar was used as the representative rate for comparison with the then existing higher rate for wool tops and the amount of countervailing duty imposed on the wool tops was calculated on that basis.

In concluding that the facts support the Treasury Department's finding that wool tops exported from Uruguay received a bounty or grant within the meaning of section 303, the majority of the Customs Court stated:

One of the purposes of Uruguay's multiple rate of exchange system was to aid industries which needed assistance in order to place products abroad. Under such a system, which assigns different exchange rates to different commodities, some exports are favored over others. In the instant case, the record shows that wool tops were favored over many other commodities and that the manufacturer was enabled to sell them to the United States profitably, which he could not otherwise have done. ¡Wool tops produced in Uruguay were offered and sold at a proportionately less price in competition with domestically produced wool tops. The percentage of wool tops imported from Uruguay increased markedly between 1950 and 1953, which increase was vastly out of proportion to the general increase in imports of this commodity. By means of the exchange rate granted to wool tops, an inducement was offered for the exportation of wool in the form of tops rather than in the form of unmanufactured wool. The result was to increase seriously the importation of wool tops into this country from Uruguay and to permit their sale at lower prices in competition with domestically produced wool tops.

It is clear from the record in this case that the Treasury Department imposed the countervailing duty on wool tops only after careful consideration of the entire situation and after circumstances had changed sufficiently to show that the preferential exchange rate had given such an advantage to Uruguayan exporters as to constitute a bounty or grant within the meaning of section 303. Although the United States and other countries may have recognized or approved multiple exchange rate systems in general and although there may have been various causes for Uruguay's action, nevertheless, section 303 of our tariff act imposing countervailing duties in certain circumstances has not been repealed. It must be applied whenever it is shown that a bounty or grant has been bestowed. The fact that United States representatives on

the International Monetary Fund and the National Advisory Council did not object to Uruguay's multiple exchange rate system in general is not relevant. Whether or not such a system is objected to, whenever the result is a bounty as to any particular article, the statute requires that countervailing duties be imposed. The facts here show that the preferential exchange rate did result in a bounty to the Uruguayan exporter.

Energetic urges to the contrary that the evidence establishes that no bounty or grant was bestowed on the wool tops in question, contending that Uruguay's multiple currency system was, in effect, a revenue measure. It further takes the position that the data used by the Treasury Department to develop the "benchmark" standard was "irrelevant and fallacious," referring in particular to the use of the relative volumes of products imported and exported in 1951 for calculating, in combination with the exchange rates for 1953, a benchmark or representative rate for the latter year.

At the outset, it is apparent that the benchmark figure of 1.86 pesos per dollar was the primary basis for the Secretary of the Treasury finding the existence of a bounty on wool tops as well as the determination or estimation of the countervailing duty assigned. Thus, the witness Hartley, in testimony quoted hereinabove, stated that the benchmark or representative rate was devised "in order to form a judgment whether or not this [the wool top exchange rate under the multiple exchange system] was a bounty." The same witness later stated that the benchmark figure of 1.86 was "suggested as a representative rate against which other rates might be judged."

It is also apparent that the multiple exchange rate system functioned as a source of revenue for the Uruguayan government. The appellee does not dispute that but urges that even though such a system may subserve a number of ends in the usual instance, "it is sufficient for purposes of section 303 if *one* of its purposes or effects is to confer indirectly a bounty or grant."

In considering whether the benchmark calculations here do in fact constitute a proper basis for determining that a bounty was bestowed, it is recognized that the determination of the existence of an indirect bounty, as the Secretary found here, ordinarily presents a far more difficult question than is encountered where a direct bounty is involved. It is also recognized that section 303 directs the Secretary to "ascertain and determine, or *estimate* the amount of the bounty." [Emphasis ours.] Nevertheless, a finding that an indirect bounty is bestowed cannot be sustained unless based on reasoning which is supported by substantial evidence. We are not satisfied that the finding in this case is so based.

On this point, the dissenting judge of the Customs Court stated:

While is [it] may have been expedient for the Treasury Department to have utilized the total Uruguayan import-export figures for 1951 together with the exchange rates in use in Uruguay in 1953, in the absence of available import-

export totals for the current year, in order to ascertain the "average rate" at which it was proper for the dollar proceeds from the involved merchandise to be converted into Uruguayan pesos, such use, would nevertheless, in the absence of more current export-import figures, have to be made at the risk and expense of accuracy, even assuming that the exchange rates remained constant during both periods. It is not unlikely that the commodity classifications within even these static rates might shift from year to year, so that the average level at which the export-import trade was conducted in 1953 might not be at the same level at which such trade was conducted in 1951. As such, the so-called "average rate" in the current year (1953) would be at variance with the "average rate" for the test year (1951). It has not been shown in the record before us that this was not the case for the year in which the involved merchandise was imported. Taking into consideration the rather flexible nature of the multiple exchange rate system under review, the ascertainment of such data for the current year would appear to be essential before any meaningful "average rate" could be arrived at. Particularly so, in view of the fact that commodity classification shifts as opposed to exchange rate adjustments are often deemed to be desirable among nations that employ multiple currency structures.

While it might well have been difficult to obtain data on the relative quantities of exports and imports of different merchandise corresponding to current multiple exchange system rates in 1953, we agree with the dissenting judge that the evidence does not show export-import data for 1951 to be so related to the 1953 rates as to provide reasonable assurance of an accurate determination. It is particularly apparent that wide fluctuations in the exports and imports of various goods are both possible and likely and, when that consideration is taken along with the obvious possibility of changes in commodity classifications, the uncertainties inherent in the procedure followed by the Secretary is further evident. Moreover, we agree with the argument of Energetic as follows:

* * * if for any of thousands of possible factors unrelated to Uruguay, there had been in 1951 a sufficiently higher level of exports of commodities having in *1953* rates higher than wool tops, or a sufficiently lower level of exports of commodities having rates lower than wool tops, the benchmark would have reached or surpassed the wool tops rate. According to the Secretary's theory, wool tops would then no longer have been receiving a grant or bounty, even if all other economic and commercial factors relating to wool tops in 1953, the date of the transactions here under review, had remained unchanged.

In fact, the difference in quantity of wool tops exported in 1951 and 1952, 3.7 million pounds and 17 million pounds, respectively, illustrates the type of year-to-year difference which could occur with respect to commodities and makes it unreasonable to rely on 1951 trade figures to obtain a representative exchange rate for 1953.

The majority of the Customs Court apparently was impressed by the fact that the Uruguayan government decree of 1947 authorized the granting of preferential exchange treatment "for industries which need it in order to place their products abroad." However, we do not find that decree of any great significance. In the first place, the decree did not originate a multiple exchange rate system in Uruguay,

such a system having been in effect since 1931.[4] Also, although the exchange rates were changed by various decrees after the 1947 decree in question, the appellee has not pointed out where any further references were made to a policy of giving preferential treatment.

Moreover, the Treasury Department, itself, did not seem to give any significant weight to the reference to preferential treatment in the 1947 decree since, previous to 1953, it took the position that the multiple exchange rate of Uruguay did not result in a bounty on wool tops. Thus, Mr. Frank Dow, as Commissioner of Customs, stated (in a letter of December 14, 1950 to the National Association of Wool Manufacturers) :

* * * It is apparent that the use of multiple exchange rates such as Argentina and Uruguay have does not result in a bounty or grant in the usual sense of the term. Quite a number of countries maintain systems of multiple exchange rates of the types here involved and this Department believes that the Congress, in enacting section 303 did not wish to embark on a widespread policing of the exchange practices of foreign countries. In looking into the Argentine and Uruguay cases with regard to the multiple exchange rate systems and comparing the various exchange rates involved, it was concluded by the Treasury that the systems in their application to the export of wool tops do not give rise to "a bounty or grant" within the meaning of section 303 of the Tariff Act of 1930.

On January 18, 1951, Mr. Dow wrote to the same association that the Treasury Department adhered to the same view, stating :

* * * it continues to be our view that the multiple exchange rates applicable to the wool products exported from Argentina and Uruguay do not give rise to a bounty or grant within the meaning of section 303 of the Tariff Act of 1930.

The majority of the Customs Court obviously was influenced by two other matters which the record shows were also considered significant by the Treasury Department in connection with its determination that countervailing duties should be assessed. One of those matters is the fact that exports of Uruguayan wool tops to the United States increased substantially from 1950 up to the time of imposition of countervailing duty in 1953. The other is that Uruguayan wool tops generally sold at a lower price than those produced in the United States.

We do not think the evidence demonstrates that those circumstances merit the significance that has been attributed to them. As to the increase in exports, the dissenting opinion states:

* * * it is also apparent from the evidence that, during this period, there also was a coincidence of timing between the influx of wool tops to this country in large quantities, and the intervention of American private capital not only in the distribution of Uruguayan wool tops, but in their production as well. * * * [Citing Senate Finance Comm. Hearings, H.R. 5505, 82d Cong., sess., pp. 209–

---

[4] The dissenting judge of the Customs Court discusses the background of the system, citing the Tariff Commission Report on Economic Controls and Commercial Policy in Uruguay (1948). Also see T.D. 52291, 84 Treas. Dec. 262.

It is of further interest that Uruguay abolished the system of multiple rates of currency exchange effective December 17, 1959 and the United States discontinued the levying of countervailing duty on wool tops on the same date. T.D. 55044, 95 Treas. Dec. 56.

212.] Certainly, the movement of tops to our markets from Uruguay was influenced to some extent, for whatever reasons, by such capital. This is clearly evident in the testimony offered by witnesses of both parties herein. * * *

In this connection, the record shows that the exporter, Engraw Export & Import Company, first started making wool tops in October of 1951 and shipped 95 percent of its output to the United States and 93 percent of that to Energetic. Evidence of the American connections of that company was given by its general manager, who testified:

XQ. Do you know how the firm name of Engraw Export and Import Company came into existence? A. Yes.

XQ. Can you explain it? A. Energetic Worsted and McGraw Wool Company from Pittsburg, apparently the owners work very closely, and I believe they combined and took the letters from the two names, and that is how Engraw came about.

XQ. They took the "En" from the Energetic Worsted? A. I have always assumed that.

XQ. And the "Graw" from the "McGraw"? A. That is right.

Also, the appellee's witness Marriner, who was engaged in the wool importing and top making business on a large scale, testified that he went to Uruguay in 1950 to investigate putting up a combing plant like the Engraw Company, although it was decided not to do so. An increased American interest and investment in connection with the export of wool tops from Uruguay thus is apparent, and the record is not convincing that the increase in such exports during the period in question was due to an effective bounty arising from the multiple exchange rates in force.

█ The price disparity between Uruguayan wool tops and those produced domestically likewise is not convincing evidence that a bounty was bestowed on the former. It is clear from the record, including particularly the testimony of appellee's expert witness Marriner, that the Uruguayan product was considered less acceptable by the trade and could not command as high a price as domestically produced wool tops.

The majority of the Customs Court, in holding that multiple exchange rate systems *can* result in a bounty or grant, relied on *F. W. Woolworth Co.* v. *United States*, 28 CCPA 239, C.A.D. 151; *V. Mueller & Co.* v. *United States*, 28 CCPA 249, C.A.D. 152, and *Robert E. Miller & Co., Inc.* v. *United States*, 34 CCPA 101, C.A.D. 349. Irrespective of whether they support that broad proposition, those decisions clearly are no authority for concluding that the procedure followed in the present case involving the determination of a weighted "benchmark" was an appropriate procedure for determining whether the Uruguayan system resulted in a bounty on wool tops.

In summary, we do not think that the record provides a substantial basis for concluding that the "benchmark" determined by the Secretary here demonstrates that a bounty was bestowed on the export of

wool tops. It follows that the majority of the Customs Court erred in overruling the protest. Additional charges by Energetic that the Secretary's order violated the Reciprocal Trade Agreement between the United States and Uruguay, that the order was invalid for failure of the Secretary to observe the requirements of the Administrative Procedure Act (5 USC 1001), and that the assessment of countervailing duties deprived Energetic of its property contrary to the Constitution, thus become moot and their merits will not be considered.

The decision and judgment of the Customs Court is *reversed*.

WORLEY, C. J., did not participate.